Filed 9/29/25  P. v. Velasquez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D083414 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF2103089) |
| LEONARD JOHN VELASQUEZ, SR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Jerry Yang, Judge.  Affirmed and remanded with directions.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Leonard John Velasquez, Sr. of sodomizing his young daughter on multiple occasions. He was given a lengthy sentence composed of determinate terms run concurrently with indeterminate terms. On appeal, he challenges the verdict, claiming the trial court committed two evidentiary errors that were individually or cumulatively prejudicial. We reject the first claim based on the harmlessness of the asserted error, and we reject the second claim because we find no abuse of discretion. Having found at most only a single trial error, we also reject Velasquez's associated claim of cumulative error.

Velasquez does not challenge the sentence imposed by the trial court. But as he observes and the People agree, the abstract of judgment and the minute order of his sentencing proceeding do not match the court's oral pronouncement of his sentence. Accordingly, we affirm the judgment in all respects and remand for the limited purpose of correcting these clerical errors.

## FACTUAL AND PROCEDURAL BACKGROUND

Velasquez was charged in an amended information with two counts of sodomy of a child 10 years old or younger (Pen. Code, § 288.7, subd. (a); counts 1, 3); four counts of forcible sodomy of a child under 14 years old and seven or more years younger than Velasquez (*id.*, §§ 269, subd. (a)(3), 286, subds. (c)(2), (c)(3) or (d); counts 2, 4, 5, 6); and two counts of forcible lewd conduct against a child under 14 years old (*id.*, § 288, subd. (b)(1); counts 7, 8). The victim in each count was Velasquez's daughter, Jane Doe. The amended information further alleged Velasquez had three prior first degree burglary convictions that qualified as strikes (*id.*, §§ 667, subds. (c), (e)(2)(A), 1170.12, subd. (c)(2)) as well as various aggravating factors.

# I.

## *Trial Evidence*

### A. *Prosecution Case*

The prosecution presented testimony from Jane, her mother (whom we will refer to as "Jane's mother" or simply "Mother"), and two expert witnesses.

#### 1. *Jane's Testimony*

Jane was born in 2009. She was in eighth grade, and had recently turned 14 years old, at the time of trial. She had one older brother and one younger brother. A couple of years before the trial, she had lived with her mother, brothers, and Velasquez in a two-bedroom house in Riverside. She and her brothers slept in one bedroom, and her parents slept in the other.

Jane believed the reason for her presence at the trial was that Velasquez, her father, had "sexually touched [her]." Jane testified she was "probably maybe four" when it started. She agreed she had told an interviewer named Barbara the touching started when she was "seven, eight or six" years old, but explained she had thought about it more and "memories just come back."

The touching normally happened when Jane's mother went shopping and brought one of her siblings, usually her younger brother. The brother who stayed home would be in the living room playing games or watching TV. Jane would be alone with Velasquez in his bedroom, and he would "touch [her] chest and [her] behind" and squeeze her breasts under her clothes. The part of Jane's "behind" that he would touch was the part she used to "[p]oop." When Velasquez would touch that part, he would take out his penis and put it in her. He would do this after he touched her breasts. He would lay down with her and put her on her stomach, then pull her pants down and lay on

3

top of her with his stomach touching her back. Then he would "[g]o up and down." When he moved his body up and down, his penis "would go in and out of [her]." Jane did not remember looking at Velasquez's penis, but she knew a penis is used for peeing and what it looks like. When her father would lay on her she felt "[s]omething hard" enter her "butt." She felt pain during these assaults. She remembered one time when she felt Velasquez's penis go farther into her anus (which she and the prosecutor referred to as "that hole" or "the part of the butt that you actually poop out of"). On that occasion, there was more pain, "like a stinging feeling." She also felt pain in her anus all the other times Velasquez moved up and down on her body.

Jane would tell Velasquez to stop, but he would respond by saying, "Just for a little bit, the pain will go away sooner or later." Sometimes he would tell her to be quiet. There were also times when Jane told Velasquez "no" before anything happened and he put his penis inside her anyways. Jane testified the way this would happen is he would "grab [her] and keep [her] down" and "force [her] into it."

There were occasions when one of Jane's brothers entered the bedroom while Velasquez was laying on her or trying to lay on her. When this occurred, Velasquez would "try to cover up what was happening" and would "act[ ] like he was just talking to [Jane]." Velasquez and Jane would have their shirts on and their pants down. Velasquez would cover Jane in a blanket and "get up to put his pants back on, and he would pretend he was doing something." Jane's brothers never said anything to her or asked her about these incidents.

Jane was six years old when Velasquez started "using his penis to go inside [her] butt." The incidents would happen at around 6:00 p.m., after he got home from work but before dinner. Jane agreed the incidents would

4

happen in the same way—"he would get on top of [her] and move up and down on [her,]" and she would feel pain in her anus. Jane did not remember all of the dates when this occurred and agreed they blended together. She initially estimated the assaults happened three or four times per week, but later testified that sometimes they would happen just once or twice a week, or there would be a couple of weeks when they would not happen at all.

There was one period in particular, however, that stood out in Jane's memory. In December 2020, when she was 11 years old, her mother went out of town for a week to attend a family wedding in Mexico. Her mother brought along her older brother; the two departed for Mexico on the night of December 24. Before leaving, Jane's mother told her to sleep in the same room as her younger brother "because of [Jane's] dad." Jane's mother said the reason was "[f]or safety." That night, Jane, her younger brother, and Velasquez slept together in the same bed. Jane's brother wanted to sleep at the edge of the bed, so Jane slept between him and Velasquez. Jane woke up in the middle of the night feeling Velasquez move around and start to touch her. As she lay on her side, he pulled down her pants and started touching her "butt." He touched her "[b]utt cheeks" with his hand, and touched her anus with his penis as in the other incidents she described. She remembered feeling pain in her anus. The incident lasted approximately 10 minutes. While this was happening, she was "frozen," unable to move, and afraid to say anything because her brother was right beside her.

The same thing happened again three more nights while Jane's mother was in Mexico. Jane tried to switch spots with her younger brother, but he wanted to sleep on the outside of the bed. The second incident happened the same way as the first. The third incident was different in that Velasquez touched Jane's breasts in addition to doing "the same thing with his penis in

5

[her] butt hole." Jane remembered having pain and redness on her breasts afterward. The fourth incident happened the same way as the first.

At the age of six, Jane tried to tell her mom what her father was doing to her. They were in the kitchen. Jane tried her best to explain what was happening, but she was not able to convey details. Shortly after this disclosure, Velasquez told Jane, "Never tell her again." For years afterward, Jane did not tell her mom about her father's behavior again because she was afraid her parents would separate or get divorced. Jane explained that she loved her father, and "[w]hen he wasn't doing that, he was really a sweet person."

Then, in June 2021, shortly after turning 12, Jane disclosed the abuse to her mother again. She did so because she "didn't want to continue living like that," "knowing that could happen at any moment." Jane and her mother were alone in the car on an errand to the store. Jane told her mother that Velasquez had sexually touched her. When they got home, Jane's mother made Jane stay in the kitchen and would not let her go to any other room unless Velasquez was not there. Jane's mother talked to Jane five to 10 more times about her disclosure, and brought Jane to a room so they could talk about areas of Jane's body where Velasquez had touched her. During these conversations, they referred to Velasquez's penis as his "[t]hing." A couple of days later, Jane talked to the police at the police station.

Jane testified that even at the time of trial she regarded Velasquez as "a sweet and caring person, even if all this is happening." Although the incidents she testified about had actually happened, she forgave Velasquez and did not want him to be in trouble.

On cross examination, Jane agreed she had told Barbara, the interviewer, that "something . . . happened" that was "the only time"

6

Velasquez "actually did something in December" (i.e., December 2020). Jane explained, "during that week was the only time of that whole month." She testified the incidents always occurred in her parents' bedroom, where there was a TV she would watch, but she agreed she had told Barbara they happened in her bedroom or her parents' bedroom.

Jane was also cross-examined about the penetrations. She agreed with defense counsel there was one occasion when Velasquez's penis actually penetrated her anus. On redirect, the prosecutor clarified that although there was one time when Jane felt more pain in her "butt hole area," she felt pain in that area all the other times as well. Jane confirmed that during those other times, she could feel Velasquez's "body part" going in and out of her anus.

On further cross-examination, defense counsel asked how Jane knew the "something" that went in her "butt" was a penis and not a finger. Jane responded that it felt "different than if it would be a finger" but agreed she was not sure. The prosecutor then clarified that when Velasquez put his "thing" in her, his pants were down; she could feel his skin on her; and his hands were underneath her, palms down, next to her shoulders. The hard "thing" that she felt going into her "butt" was at the level of his hips.

2. *Mother's Testimony*

Mother married Velasquez in 2002. The couple would correct or discipline their children when they misbehaved. Jane would listen when Velasquez would correct or discipline her.

In December 2020, Mother flew to Mexico with her older son to attend her sister's wedding. Mother asked Velasquez if she could take all of her children, but he said it would be too costly for the whole family to go. Before leaving, Mother encouraged Velasquez to sleep with the children so they

7

would not "be alone in their bedrooms." She left for Mexico on December 24 and returned on January 1, 2021. While she was gone, she talked to Jane and her younger brother every day via video chat.

About six months later, Jane disclosed her father's sexual abuse. The two were sitting in a parking lot during a trip to the store. Jane said she was being touched in an inappropriate way, and the person who was touching her was her father. Jane also said she had not wanted to tell her mother about it because she did not want her parents to get separated. Jane gave different dates or ages when the touching happened—first age 11, then age seven. Mother initially testified Jane did not remember a "younger date." She then admitted, with apparent reluctance, telling an officer Jane said "daddy [has been] abusing me since I was . . . five or six years old." Mother insisted, however, that Jane "changes the dates." She claimed Jane's demeanor during the disclosure was "[n]ormal, regular." She denied that Jane had tears in her eyes and suggested an earlier statement to the contrary was untrue.

Jane told Mother the abuse happened when Mother "wasn't there" and her older brother was at his desk. It was normal for Jane's older brother to play games with his headphones on. When asked whether she sometimes took Jane's older brother grocery shopping, Mother claimed she only did so in 2018 or 2019 when she was recovering from shoulder surgery for eight or nine months.

Jane did not say much to Mother about the abuse, which Mother considered normal because Jane was a very quiet person. After listening to Jane, Mother was in shock and disbelief. Mother was molested as a child, and she found the accusation upsetting. She started considering precautions to take in the event what Jane had disclosed turned out to be true. She

8

asked Jane to write about what had happened because she did not want Jane to lie. She also spoke to Jane several more times about the abuse. During one of these conversations, Jane said her father had "put his thing on her butt." To further ferret out what had happened, Mother took Jane to a bedroom, locked the door, and directed Jane to role play the abuse with her, with Jane playing the part of Velasquez. Specifically, Mother put Jane's hands on her breasts and told Jane to explain what happened. In response, Jane said, "I can't, Mom. I can't." Mother also looked into the consequences to herself if she did not report the abuse to law enforcement.

Around three days after Jane's disclosure, on June 12, 2021, Mother packed the car and took her kids to a female friend's house. Then she took Jane to the police.

Mother denied that Velasquez had ever engaged in or attempted anal intercourse with her. Both she and her husband "were in agreement to having normal sex," meaning "[t]hrough the vagina." Mother acknowledged they had never discussed anal intercourse, but stated Velasquez always knew what she wanted.

Mother agreed the criminal process had been hard on her and she felt stuck between two people she loved. Her husband was her family's sole financial provider, and he kept some of his finances separate from her. Mother also felt her sons were suffering from not having contact with their father. Six months before Velasquez's trial, Mother took Jane to court to drop a restraining order against Velasquez because Mother wanted for herself and her sons to be able to contact him.

3. *Forensic Examiner's Testimony*

Pediatrician Sophia Grant, M.D., is the medical director for the Riverside County Child Assessment Team. She has personally evaluated

9

thousands of children for findings in cases of neglect or sexual abuse, and she trains other doctors and nurses how to perform forensic medical examinations.

For several reasons, the vast majority of confirmed cases of sexual abuse have normal exams. First, quite frequently, the child's disclosure of abuse happens a long time after the initial event, and any damage caused has already healed. Second, and relatedly, the vagina and anus are very rich in blood supply and heal rapidly. Third, when children are sexually naïve, what is perceived by the child as full penetration might be less than full penetration. But to the inexperienced child, it feels "like it went all the way in."

Dr. Grant performed a forensic examination of Jane on June 23, 2021, including a head-to-toe assessment and an exam of her genital and anal regions. Jane reported there was anal contact or penetration by the penis of her father, with associated pain. When asked whether there was anal contract by a finger, Jane said she was unsure, but "I think so." Jane also indicated there were other acts that did not involve her genitals, including biting, licking, and kissing.

Dr. Grant examined Jane's anal region visually and using magnification. The exam was normal, meaning there were no findings of acute trauma and no bleeding, tears, scarring, or anal dilation. The lack of findings was consistent with the history Jane provided.

4. *CSAAS Expert's Testimony*

Jodi Quaz, Ph.D., is a developmental psychologist and an expert witness in the area of general characteristics that affect children's accuracy, including delayed disclosure, recantation, suggestibility, and long-term memory. She was familiar with child sexual abuse accommodation syndrome

10

(CSAAS), which she described as patterns of disclosure that may seem unusual in adults but are observed quite often in children. These patterns include delayed disclosure, which is simply an unwillingness to tell. It is unusual for children to tell about their abuse right away. The most common reasons for this are familial pressures, whether the perpetrator is a close family member, and the extent to which the family is supportive of the victim.

Also, the more closely related a child is with the abuser the more likely the child will be reluctant to disclose, because the child does not want to harm their family. A child may not be frightened of their abuser if the abuse happens in a family relationship. During the actual act the child will be afraid, but the relationship might look normal from the outside. If the abuse has been gradual in the context of an otherwise close relationship, it becomes just one unpleasant part of an otherwise positive relationship.

The age of the child matters. Very young children may sometimes tell accidentally, whereas older children have a better understanding of consequences and may wait longer to disclose. Children may also have a hard time understanding the abuse is wrong; if it happens repeatedly they may believe it is a form of love or affection.

It is common for a child not to remember every detail of the abuse. When children experience something repeatedly, they tend to form a gist, or general description, of the event based on what usually happened. It is not common for children to report all details of their abuse the first time they disclose. Children sometimes disclose incrementally, which may be attributable to reminder cues triggering more memories, or to a strategic decision to see what happens before disclosing more.

11

Finally, children are more suggestible than adults. It is important for interviewers to ask children open ended questions, because suggestive questions can affect the accuracy of children's reporting.

B.    *Defense Case*

The defense evidence consisted of the testimony of Velasquez. Velasquez denied having any sexual contact with his daughter.

He described Jane as very quiet, with moments of defiance like any other child. Velasquez was a landscaper and would work six or seven days a week, typically arising for work at 4:00 a.m. and returning home at around 4:30 or 5:00 p.m. Three or four days a week, he would leave for the gym half an hour after getting home. Two or three times a week, on days he did not go to the gym, his wife would go shopping while the kids were at home.

Velasquez denied ever having anal sex with his wife. When asked whether he ever attempted anal sex with her, he asked if he could explain. He then said that in the middle of his relationship with his wife, "in the heat of the moment," his penis would "slip out . . . from vaginal sex" and would be "in the vicinity" of anal sex. She would then "guide" him back, but there would be no discussion about "do[ing] this." He never actually said to her, "Can we have anal sex?"

Around Christmas of 2020, Velasquez's wife and older son traveled to Mexico. During the week that they were away, he slept in the same bed with his daughter and younger son. He did this because Mother was afraid someone might break into the house while the children were alone in their room. It was a king-sized bed; he slept on one side, and the children slept on the other. Velasquez did not pay attention to which child slept where.

Around June of 2021, Velasquez noticed a change in Jane's demeanor. She seemed distant and was unable to look him in the eye. When he got

12

home from work on June 12, the house was empty.  He became concerned and started to panic after calling and texting his wife and receiving no response.  He searched for Mother to no avail and eventually summoned the police to report that she was missing.

The next time Velasquez had contact with Mother was two days later.  It was at this point that he learned about Jane's accusations.  Mother told him there would be a physical examination.  Velasquez had no concerns or objections to Jane being physically examined.

C.    *Closing Arguments*

In closing arguments to the jury, the prosecution emphasized the difficulties Jane experienced not only in sustaining the abuse but in disclosing it to her mother and testifying about it to the jury.  The prosecutor told the jury "[t]hat little girl['s] . . . spirit is dead," and argued her delayed disclosure and inability to recall every detail of her abuse were normal and expected.  The prosecutor argued that Jane was credible, and her testimony that she experienced anal pain each time Velasquez touched her buttocks with his penis was evidence his penis penetrated her anus.  Mother, the prosecutor claimed, had "play[ed] both sides" by partly validating Jane's testimony while also minimizing the abuse.

The theme of the defense closing was that Mother had inadvertently manipulated Jane's story of abuse through suggestive questioning.  Jane did not recall details, defense counsel claimed, because the abuse did not happen.  Jane's story had evolved from mere touching to sodomy because Mother had pressured Jane into creating evidence, and because Mother engaged in suggestive demonstrations like grabbing Jane's hands and putting them on her breasts.  Jane was obedient, nonassertive, and easily suggestible, as evidenced by the number of times she agreed with the attorneys' questions.

13

But her claims against Velasquez were "ridiculous[ ]," including because there was no physical evidence after years of alleged sodomy.

## II.

### *Verdict and Sentencing*

After deliberating for less than three hours, the jury found Velasquez guilty on all counts in the information.

Velasquez then admitted sustaining the three convictions alleged as prior strikes.[1] He waived his right to a jury trial on aggravating factors. Based on the trial evidence, the trial court found two aggravating factors— that Jane was a particularly vulnerable victim and Velasquez took advantage of a position of trust (Cal. Rules of Court, rule 4.421(a)(3), (11))—true beyond a reasonable doubt.

At sentencing, in response to a defense request, the trial court dismissed two of the three prior strike allegations pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. The court imposed consecutive, double base-term sentences of 50 years to life on counts 1 and 3 and 30 years to life on counts 2, 4, 5, and 6, for a total indeterminate term of 220 years to life. It imposed doubled mid-term sentences of 16 years on each of counts 7 and 8, for a total determinate term of 32 years. The court ran the sentences on the determinate counts concurrently with the sentences on the indeterminate counts. Velasquez's total resulting sentence was 32 years concurrent to 220 years to life.

---

1    At the request of the parties, the trial court interlineated the amended information to reflect that the first and second convictions were sustained on December 11, 1989 rather than January 8, 1990.

# DISCUSSION

## I.

### *No Prejudicial Evidentiary Error*

Velasquez's first challenge to the verdict is that the trial court committed prejudicial evidentiary error when it prohibited him from testifying he "encouraged" the physical examination of Jane but permitted him to testify he had no objections or concerns about the prospect of such an examination. We reject this challenge because even assuming the limitation on Velasquez's testimony was erroneous, we are not persuaded the error was prejudicial.

### A.  *Additional Background*

As we have mentioned, Velasquez testified he first learned about Jane's allegations against him in June 2021, during a phone call with his wife. On direct examination, defense counsel asked Velasquez how he felt when he learned Jane was making accusations against him. He answered, "I felt like I was blindsided. I was just in – I was distraught." His counsel asked, "As a result of your contact with your wife on that Monday, did you encourage her to take [Jane] for a physical examination?" The prosecutor objected to the question on hearsay and relevance grounds, and the trial court sustained the objections.

During a recess, defense counsel explained she intended to elicit that Velasquez encouraged the physical examination, not to delve into the contents of the call. Counsel argued this testimony had a relevant, non-hearsay purpose, namely to show Velasquez's state of mind and "whether or not he had any consciousness of guilt." The court disagreed the evidence had a valid non-hearsay purpose, stating criminal defendants ordinarily are not permitted to testify about their prior denials of guilt. The court also

15

disagreed the evidence had probative value, as counsel had already elicited evidence insinuating that Velasquez had "denied doing it." The court ruled, however, that the question could be reworded to avoid eliciting Velasquez's own prior statements.

When the trial resumed, defense counsel asked Velasquez, "Did you know at some point that [Jane] was going to be physically examined?" He answered, "Yes." Counsel then asked, "And did you have any, like, objection or concern about her being examined physically?" Velasquez answered, "I encouraged it." The prosecutor objected and moved to strike based on the trial court's prior ruling, and the court sustained the objection and struck Velasquez's response. Defense counsel then asked, "So just as a yes or no, did you have any objections or concerns to [Jane] being physically examined?" Velasquez responded, "No."

B.    *Contentions and Analysis*

Relying on *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*), Velasquez contends it was reversible error to exclude his statement, "I encouraged it." He contends that under *Cowan* the statement was admissible nonhearsay. We conclude that any such error was harmless.

In *Cowan*, our Supreme Court held it was error to exclude on hearsay grounds the defendant's out of court statement offering to " 'come down right now' " and speak to an investigating detective. (*Cowan*, *supra*, 50 Cal.4th at p. 472.) The offer to talk to the detective was not hearsay but " 'simply verbal conduct' consisting of a proposal to perform an act, and therefore was 'neither inherently true nor false.' " (*Ibid.*) "Furthermore, the statement was 'offered for the nonhearsay purpose of demonstrating consciousness of' innocence." (*Ibid.*) The court concluded there was no abuse of discretion, however, because the evidence was subject to exclusion under Evidence Code section

16

352.[2] (*Cowan*, at pp. 472–474.) The court reasoned the evidence had only slight probative value because there are "numerous plausible reasons why a guilty person might offer to talk to the police." (*Id.* at p. 473.) The risk of confusing the issues or of delaying the trial, on the other hand, was strong because the prosecution would have been entitled to explain the circumstances surrounding the statement and present evidence negating an inference of innocence. (*Ibid.*)

Velasquez argues that under *Cowan*, his statement that he "encouraged" the physical examination of Jane was nonhearsay verbal conduct offered for the relevant purpose of demonstrating his mental state when he first learned about Jane's accusations was one of innocence. He contends the statement was less ambiguous, more probative, and less likely to lead to juror confusion than the statement in *Cowan*, such that its exclusion cannot be upheld under section 352. The People do not dispute that Velasquez's statement was relevant nonhearsay, but they argue that it was subject to section 352 to the same extent as the statement in *Cowan*.

We need not resolve these issues. Even if we assume it was error to exclude the statement, Velasquez fails to show the error was prejudicial. Whereas Velasquez contends the error violated his federal constitutional rights, we find the error was one of state law only. "As a general matter, the application of the ordinary rules of evidence does not impermissibly infringe on a defendant's right to present a defense. Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7

---

[2]      Further undesignated statutory references are to the Evidence Code.

Cal.4th 1075, 1102–1103 (*Fudge*) [cleaned up]; accord, *People v. Boyette* (2002) 29 Cal.4th 381, 427–428 (*Boyette*); *People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4 (*Bacon*); see *Bacon* at p. 1104, fn. 4 ["only evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense"].)

Here, the trial court did not completely exclude evidence of Velasquez's consciousness of innocence defense. Although the court did not let Velasquez say he "encouraged" having Jane physically examined, it allowed him to testify he had no concerns or objections about the examination. Velasquez was also permitted to testify that when he heard about the accusations, he felt "blindsided" and "distraught," inferably because the accusations did not match his own perception of his past behavior. Thus, although the court prevented Velasquez from saying he "encouraged" the physical exam, he "was not otherwise precluded from presenting his [consciousness of innocence] defense through admissible testimony and evidence." (*Cowan, supra*, 50 Cal.4th at pp. 473–474.)

Any error in the ruling therefore did not violate the federal Constitution but instead was "an error of law merely; there was no refusal to allow defendant to present a defense, but only a rejection of some evidence concerning the defense. Accordingly, the proper standard of review is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836, and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension (*Chapman v. California* (1967) 386 U.S. 18, 24)." (*Fudge, supra*, 7 Cal.4th at p. 1103 [cleaned up] ; accord, *Boyette, supra*, 29 Cal.4th at pp. 427–428; *Bacon, supra*, 50 Cal.4th at p. 1104, fn. 4.) Accordingly, we may reverse the judgment only if Velasquez shows it is

18

"reasonably probable that a result more favorable to [him] would have been reached in the absence of the error." (*Watson*, at p. 836.)

We are not persuaded such a reasonable probability exists. Velasquez argues the trial was a credibility contest; a defendant's uncorroborated, self-serving denials are generally not compelling to juries; and the prosecutor attacked his credibility as a witness. He contends the excluded evidence "would have bolstered his testimony against the prosecutor's attack." But the corroborative value of the excluded testimony was in its tendency to show Velasquez's immediate mental state at the time he learned about Jane's accusations, like his mindset at the time of trial, was one of innocence. Yet the testimony he was permitted to give already made this clear. That Velasquez felt distraught and blindsided when he heard about Jane's accusations, and had no objection, not even a concern, about the prospect of a physical exam of Jane, conveyed that from his standpoint the accusations were not true. The jury heard this testimony and had the opportunity to consider it, but did not find his protestations of innocence to be credible.

Moreover, Velasquez's mental state on learning of the accusations was not a critical part of the defense presentation to the jury. Defense counsel's closing argument was primarily focused on attacking Jane's credibility on the ground she was highly impressionable and the accusations were the product of Mother's inadvertently suggestive questions. To the extent counsel addressed Velasquez's behavior at or near the time Mother told him about Jane's accusations, she did so in just two short paragraphs out of a closing argument that lasted for 33 pages of trial transcript. Nor do we find any indication in the record that Velasquez's reaction to learning of the accusations was a focus of jury deliberations. Finally, the jury deliberated less than three hours before reaching its verdict, which tends to show it did

19

not consider the credibility contest, or the case, to be close or difficult. (See *People v. Walker* (1995) 31 Cal.App.4th 432, 438–439 [six and one-half hours of jury deliberation did not indicate "the case was closely balanced"]; *People v. Anzalone* (2013) 56 Cal.4th 545, 555, 560 [trial error found harmless under *Watson*, including because jury deliberated for only three hours before reaching verdict].)

Because we do not perceive a reasonable probability that admission of the challenged evidence would have changed the outcome of the trial, we reject Velasquez's first claim of prejudicial evidentiary error.

II.

*No Abuse of Discretion*

Velasquez's second claim of evidentiary error arises from the trial court's exclusion, under section 352, of evidence Jane previously accused her great uncle of sexually assaulting her. He contends the trial court erred when it concluded the probative value of this evidence was substantially outweighed by the danger its admission would consume undue time. As we will discuss, he fails to establish an abuse of discretion.

A.     *Additional Background*

Prior to trial, Velasquez filed a motion in limine seeking the admission of evidence that before Jane accused him of sexual abuse, she accused her great uncle of touching her vaginal area or buttocks when she was seven or eight years old. Velasquez argued the prior accusation was false and therefore relevant to Jane's credibility under *People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456 (*Tidwell*). The prosecution sought to exclude the evidence under section 352, arguing the prejudice flowing from its admission would substantially outweigh its probative value.

20

At the in limine hearing, defense counsel acknowledged it was inconclusive whether Jane's prior accusation had merit. It was not the type of allegation that would lend itself to a physical finding, and the state of the evidence was "essentially the alleged victim saying that it happened, and [the great uncle] saying that it did not." In counsel's words, whether the allegation was true or false "would come down to who the jury believed." The trial court granted the prosecution's motion and denied the defense motion under a section 352 analysis, stating the evidence was extrinsic and would necessitate "a trial within a trial of these other allegations," resulting in undue consumption of time.

In the middle of trial, after Jane finished testifying, defense counsel provided additional information in an effort to persuade the court to admit evidence of her prior accusation against her great uncle. Counsel stated Jane had reported the incident to Mother either in 2020 (according to Jane) or in April or May of 2021 (according to Mother). Mother, in turn, told Velasquez what Jane had reported, but he appeared unconcerned, and nothing was done. Counsel argued that Jane's disclosure about the great uncle, and Velasquez's failure to do anything about it, gave Jane a motive to accuse Velasquez. Counsel argued the evidence was also relevant to counter the inference Mother was biased in favor of Velasquez, because Mother had been just as hesitant to report Jane's accusation against the great uncle as she had been to report her accusation against Velasquez.

The trial court declined to admit the evidence, again based on a section 352 analysis. On the one hand, the court found the defense motive-to-lie theory speculative, because "[t]hat type of a retaliation . . . seems completely disproportionate to any alleged failure to protect," and there had been no evidence Jane harbored such a motive. On the other, delving into the theory

would necessitate a side trial about whether the prior accusation was true or not. The court similarly rejected use of the evidence to show Mother's lack of bias, reasoning Mother had primarily testified about uncontested matters such that any probative value was limited and outweighed by undue prejudice and consumption of time.

Shortly after the prosecution rested, the defense again sought permission to pursue the motive-to-lie theory, this time by having Velasquez testify he believed Jane's allegations against him were in retaliation of his failure to protect her after he learned about her accusation against her great uncle. The court responded that Velasquez's belief appeared speculative and lacking in foundation, including because there was no evidence Jane had been angered by his response to the accusation. Defense counsel stated the evidence would nevertheless support an inference Jane had a motive to fabricate her accusations against Velasquez. Counsel also pointed to evidence that Jane told investigating officers Mother had discussed the accusation with Velasquez but he did not seem to care, and Mother had been concerned the great uncle would react violently if confronted about it. The court did not agree this evidence showed Jane harbored anger at a level that would cause her to make "these kinds of allegations against her own father." The court also expressed concern Jane's prior accusation was not demonstrably false.

The trial court ultimately declined the request. The court agreed with the defense the evidence was not made inadmissible by section 782, but ruled it was subject to exclusion under section 352. The court found the probative value of the evidence was limited, whereas proving and rebutting the defense motive-to-lie theory would be time consuming. Pursuing the theory would involve more than presenting the testimony of the great uncle, because the

People would need to recall Jane and Mother as well as collateral witnesses to corroborate Jane's claims. This would necessitate not just a side trial, but doing "a huge portion of the trial over."

B. *Contentions on Appeal and Analysis*

Velasquez contends the trial court erred and violated his constitutional rights by excluding evidence of Jane's prior accusation against her great uncle. More specifically, he argues it was an abuse of discretion for the court to conclude the probative value of the evidence was exceeded by the danger its presentation would consume undue time. He argues the evidence was probative of Jane's credibility, a critical issue in the case. He observes that the prosecution was allowed to spend time bolstering Jane's credibility and attacking Velasquez's credibility, while he was denied the ability to cross-examine Jane and Mother, "both of whom were on the stand," or to call the great uncle as a witness.

As an initial matter, Velasquez does not make clear which of the defense theories of admissibility he is seeking to vindicate. The only theory that could have been pursued by cross-examining Jane and Mother while they were "on the stand" was the one raised before trial—the theory that Jane's prior accusation against the great uncle was false and therefore relevant to her credibility. The second theory—that Velasquez's inaction in response to Jane's prior allegation gave Jane a motive to lie—was not raised until after Jane finished testifying and was no longer "on the stand." However, although his arguments are imprecise, Velasquez has not clearly excluded the second theory from his appellate challenge.[3] As a result, we will consider both theories, addressing each in turn.

---

[3] It is clear, however, that Velasquez's appellate challenge does not encompass the trial court's rejection of the theory Mother's response to the

23

Starting with the first theory, the trial court acted within its discretion by excluding Jane's prior complaint about the great uncle on the ground it was false and directly undermined her credibility. The court based its ruling on section 352, and specifically on the limited probative value of the complaint given the uncertainty it was false, and the trial-within-a-trial that would result from litigating its veracity. Under section 352, a court has discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We do not find this ruling to be an abuse of discretion. (See *Tidwell*, *supra*, 163 Cal.App.4th at p. 1457 [" '[A] trial court's exercise of discretion under [§] 352 will not be reversed on appeal absent a clear showing of abuse.' "].)

The defense motion in limine was based in part on *Tidwell*. In *Tidwell* and the line of cases that includes *Tidwell*, courts upheld the exclusion of similar assertedly false victim complaints under section 352. (*Tidwell*, *supra*, 163 Cal.App.4th at p. 1457; *People v. Winbush* (2017) 2 Cal.5th 402, 469 (*Winbush*); *People v. Miranda* (2011) 199 Cal.App.4th 1403, 1424–1425 (*Miranda*); *People v. Bittaker* (1989) 48 Cal.3d 1046, 1097 (*Bittaker*).) Under

---

prior complaint was relevant to show Mother was not biased in favor of Velasquez. His appellate briefs are devoid of any developed argument challenging this ruling. His opening brief lacks any such argument, and his reply brief offers only the bare acknowledgement that he sought to admit evidence of the prior accusation at trial for the foregoing purpose. Accordingly, any challenge to this ruling has been forfeited. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [challenge forfeited where not raised in opening brief]; *People v. Stanley* (1995) 10 Cal.4th 764, 793 [deeming waived a defendant's argument on appeal that merely "makes a general assertion, unsupported by specific argument"].)

these cases, "[e]vidence of a prior false report of molestation or rape is relevant to the credibility of the victim." (*Miranda*, at p. 1424.) However, prior complaints of molestation "do not reflect on credibility *unless proven to be false.*" (*Ibid.*, italics added, citing *Bittaker*, at p. 1097 and *Tidwell*, at p. 1457.) "[I]f proof of the falsity of the prior complaint 'would consume considerable time, and divert the attention of the jury from the case at hand,' " the trial court has discretion to exclude the prior complaint under section 352. (*Miranda*, at p. 1424, quoting *Bittaker*, at p. 1097.)

In *Bittaker*, a witness testified that after she rejected the defendant's sexual advances, he pulled a gun and said, " 'you wouldn't argue if I pulled the trigger.' " (*Bittaker*, *supra*, 48 Cal.3d at p. 1097.) Defense counsel sought to impeach the witness with evidence she had falsely accused two other men of sexual molestation. The trial court upheld an objection under section 352, and our high court held the ruling was not an abuse of discretion. (*Bittaker*, at p. 1097.) It explained: "The value of the evidence as impeachment depends upon proof that the prior charges were false. This would in effect force the parties to present evidence concerning two long-past sexual incidents which never reached the point of formal charges." (*Ibid.*)

In *Tidwell*, the defendant was charged with raping a woman with a learning disability. (*Tidwell*, *supra*, 163 Cal.App.4th at pp. 1448–1449.) The defense sought to impeach the victim with evidence of her prior false complaints of rape. (*Id.* at pp. 1452–1453.)

The trial court declined the defense request, and the Court of Appeal upheld the ruling under section 352 and *Bittaker*. The court explained that although there was some evidence the witness made inconsistent statements, "there was no conclusive evidence that her prior rape complaints were false." (*Tidwell*, *supra*, 163 Cal.App.4th at p. 1458.) The defense had been unable to

obtain evidence from the alleged perpetrators, and the inferences of truth or falsity could have been drawn either way. (*Id.* at pp. 1457–1458.) "In addition to the weaknesses in the evidence concerning falsity of the rape complaints, admitting the evidence would have resulted in an undue consumption of time as the defense attempted to bolster its view and the prosecution introduced evidence that [one of the men accused of a prior rape] had raped another female student. We therefore cannot say that the trial court abused its discretion in excluding the evidence based on the weak nature of the evidence of falsity of the complaints and the confusion of the jury and consumption of time it would have engendered for the parties to . . . litigat[e] the truthfulness of [the] prior complaints." (*Id.* at p. 1458.)

*Miranda* involved charges the defendant sexually molested his disabled teenaged granddaughter. (*Miranda, supra,* 199 Cal.App.4th at pp. 1407–1408.) The theory of the defense was that the accusations were motivated by the victim's mother, who wanted to maintain custody of the victim and the victim's brother, who claimed to have witnessed the molestation. (*Id.* at pp. 1423–1424.) The defense sought to bolster its theory through the evidence the victim had falsely reported being sexually abused by her father. (*Ibid.*) Defense counsel proffered that the mother would testify about the report, and the father would testify the sexual abuse did not happen. (*Id.* at p. 1424.) The trial court declined to admit this evidence, and the appellate court upheld the exclusion under section 352 as well as *Tidwell* and *Bittaker*. The victim's complaint "would only be relevant if false, and no clear showing of falsity was made." (*Miranda,* at p. 1425.) On the other hand, "delving into the issue had the potential for confusing the jury and consuming an undue amount of time" because it involved custody matters "far afield from the charges in this case." (*Id.* at pp. 1425–1426.)

26

Most recently, the California Supreme Court followed *Tidwell* and *Bittaker* in a capital case. (*Winbush, supra*, 2 Cal.5th at pp. 468–469.) During the penalty phase, the prosecution introduced evidence the defendant had committed forcible sexual assault on a witness. (*Id.* at p. 468.) The defense sought to cross-examine the witness about two prior false claims of rape. (*Ibid.*) The trial court precluded these lines of questioning, and our high court upheld the ruling under section 352. (*Winbush*, at p. 469.) Because the witness denied making the first accusation, for the defense line of questioning to have relevance, it "would have had to establish both that the accusation was made *and* that it was false." (*Ibid.*) The trial court reasonably concluded this inquiry would consume undue amounts of time. (*Ibid.*) The second claim was not of rape but merely of a sex act. It had conceivable relevance only if shown to be false, yet defense counsel did not have "ready proof" of falsity. (*Ibid.*) "The court acted well within its discretion in preventing this fishing expedition from diverting undue time and attention from the trial." (*Ibid.*)

Similarly, here, the probative value of the evidence of Jane's prior complaint against her great uncle was uncertain. A prior false complaint would have established an instance of dishonesty on a similar topic. Here, however, there was no "ready proof" (*Winbush, supra*, 2 Cal.5th at p. 469) or "clear showing" (*Miranda, supra*, 199 Cal.App.4th at p. 1425) the prior complaint was false. Although defense counsel argued it was false, counsel conceded the evidence of truth and falsity was evenly balanced, with the "alleged victim saying that it happened, and [the great uncle] saying that it did not." Not only was the falsity of the complaint uncertain, but litigating the issue created a substantial danger of diverting the jury's attention and consuming an undue amount of time. Like *Miranda*, admitting the evidence

27

would merely have created a second credibility contest for the parties to litigate and the jury to decide. (*Miranda*, at p. 1425.) Attempting to prove or rebut the falsity or the prior accusation would not necessarily have been limited to examining Jane, Mother, and the great uncle, as the proffered evidence included official interviews of Jane and the great uncle. When we consider these circumstances in light of the foregoing cases, we cannot say the trial court abused its discretion by excluding the prior complaint under section 352.

The defense's second attempt at persuading the trial court to admit Jane's prior accusation, made for the first time in the middle of the trial and again after the close of the prosecution's case, did not tip the balance of the section 352 factors in its favor. As mentioned, under this theory, Jane's prior accusation coupled with Velasquez's impassive response to it gave Jane a reason to be angry and to retaliate against him by falsely accusing him of sexual abuse.

This theory of admissibility was more attenuated, and less probative of Jane's credibility, than the first defense theory. It required the jury to determine whether Velasquez's response after learning about the prior complaint angered Jane and motivated her to lie, and if so whether she was acting under that motivation when she disclosed Velasquez's abuse to Mother. It also required the jury to resolve the disputed issue of when Jane made the prior complaint against her great uncle. Moreover, as the trial court pointed out, the theory was at least partly unfounded as there was no evidence Jane was angry at Velasquez when she disclosed his abuse to Mother.

Thus, the motive-to-lie theory of the admissibility of Jane's prior complaint was simultaneously less probative, more complex, and more likely

28

to lead to juror confusion, than the first theory. And it did not stand to consume less time or cause less trial disruption. At the point of the trial when the defense first introduced the motive-to-lie theory, proving the theory would have necessitated recalling Jane as a witness, in addition to authorizing the examination of Mother, and calling the great uncle and any other supporting or rebutting witnesses. The danger of delay and disruption was even greater when the defense renewed its request to pursue the motive-to-lie theory, because by then, Jane and Mother had already finished testifying, the prosecution had already rested its case, and the difficulty of permitting the defense to pursue the theory had only increased. In short, the motive-to-lie theory carried less probative weight, and created a greater danger of juror confusion and undue consumption of time, than the first defense theory. Our conclusion that the balance of section 352 factors supported the rejection of the first defense theory compels us to reach the same conclusion with respect to the second defense theory.

Velasquez's appellate arguments do not persuade us to reach a different conclusion. He asserts in his opening brief that Jane's credibility was critical to the prosecution's case. However, victim credibility was also critical to the prosecution's cases in *Tidwell* and *Miranda*, and yet those courts upheld the exclusion of similar evidence. Although the defense relied on *Tidwell* in the trial court, on appeal Velasquez does not discuss or attempt to distinguish *Tidwell* or the line of related cases we have summarized above. Instead, he relies on a single case, *People v. Stewart* (2020) 55 Cal.App.5th

29

755 (*Stewart*).  However, *Stewart*, which involved an asserted *Brady*[4] violation, is factually and procedurally distinguishable.

The defendant in *Stewart* was charged with sexually assaulting his cousin, Jane Doe 1, when he was 19 years old and she was 15.  (*Stewart*, *supra*, 55 Cal.App.5th at p. 759.)  At trial, Doe 1 testified the defendant touched her vagina and inserted his penis in her vagina and anus while visiting her family's house during a holiday.  (*Id*. at p. 764.)  The prosecution was permitted to introduce propensity evidence in the form of testimony from Jane Doe 2, a cousin of the defendant's on a different side of the family.  (*Id*. at p. 766.)  Doe 2 testified the defendant molested her on two occasions.  The first incident happened when she was 11 years old.  (*Ibid*.)  When she was 14, he assaulted her again.  (*Ibid*.)  Doe 2's mother then testified about Doe 2's disclosures, and a police officer testified about the investigation of Doe 2's accusations, interview of Doe 2, and contacts with Doe 2's mother.  (*Id*. at p. 767.)

After the defendant was convicted, the defense moved for a new trial on the ground there had been a *Brady* violation.  Before trial, defense counsel had asked the prosecutor to produce a copy of a police report investigating a prior incident in which Doe 2 described being touched by someone other than the defendant, but the prosecutor refused and the trial court informed the defense it would have to obtain the information by petitioning the juvenile court.  (*Stewart*, *supra*, 55 Cal.App.5th at p. 761.)  The juvenile court did not produce reports until after trial.  (*Id*. at p. 762.)  One of the reports included allegations by Doe 2 in which she described being sexually abused by a male

---

[4]   *Brady v. Maryland* (1963) 373 U.S. 83, held the due process clause requires the prosecution to turn over material information favorable to the defense.

cousin (apparently not the defendant) starting when she was eight or nine years old. (*Id.* at pp. 762, 763.) The abuse included an incident when she was 11 years old and the cousin was 12 years old, and consisted of multiple sexual contacts (weekly oral copulation as well as two or three incidents of vaginal or anal sex). Doe 2 had alleged that she was forced to participate in the incidents, but her brother, who had witnessed at least one incident, claimed that she participated voluntarily. (*Ibid.*) Doe 2's allegations about this abuse "were determined to be 'unfounded.'" (*Id.* at p. 776.) The defense argued a new trial was warranted based on the new evidence and on the ground the prosecution's failure to disclose the evidence violated *Brady*. (*Stewart*, at p. 762.) The trial court denied the motion, in part because the evidence would have been excluded under section 352. (*Stewart*, at p. 763.)

The Court of Appeal reversed. It held the prosecution's failure to disclose the evidence violated its obligations under *Brady*. (*Stewart*, *supra*, 55 Cal.App.5th at pp. 770–784.) It reasoned the evidence was exculpatory or impeaching because it revealed Doe 2, a key prosecution witness, "had been sexually active from a young age, was accused of having been a willing participant in those acts, and had engaged with another child in the same acts she accused [the defendant] of perpetrating without her consent." (*Id.* at p. 776.) The defense could also have argued that Doe 2 was "confusing one cousin with the other or not being truthful." (*Id.* at p. 781.) Also, Doe 2 had implied at trial that she had not previously experienced sexual activity, a fact the suppressed report directly refuted. (*Id.* at p. 782.)

The court also disagreed the evidence would have been subject to exclusion under section 352. (*Stewart*, *supra*, 55 Cal.App.5th at pp. 784–785.) "Where prior claims of sexual abuse are directly relevant to the credibility of the complaining witness, or in this instance, a propensity witness whose

31

testimony was central to the trial, a defendant's right to a fair trial requires that he be allowed to use evidence relevant to that witness's credibility to impeach him or her." (*Id.* at p. 785.) The court found any undue consumption of time "could have been avoided by limiting the time devoted to such cross-examination to a degree commensurate with the witness's direct examination and the relevance of the impeachment testimony" (*ibid.*), and by following the procedures in section 782 by requiring the defense to make offers of proof and show the relevancy of the sexual conduct outside the presence of the jury (*Stewart*, at p. 785).

*Stewart* does not persuade us the trial court improperly balanced the section 352 factors. The proper application of section 352 to an assertedly false prior accusation of sexual abuse was addressed in *Tidwell* and *Miranda* as well as by our high court in *Bittaker* and *Winbush*. The latter cases are more closely analogous to this one and, for the reasons we have discussed, they support the conclusion the trial court did not abuse its discretion when it declined to admit the accusation for the purpose of impeaching Jane's credibility.

Nor does *Stewart* persuade us the trial court erred when it declined to admit the prior accusation about the great uncle, along with the added facts of Jane's disclosure of it to Mother, Mother's report to Velasquez, Velasquez's inaction and Jane's asserted anger and desire to retaliate, as proof of Jane's motive to lie. First, unlike the evidence suppressed in *Stewart*, this motive evidence was not "directly relevant to the credibility of the complaining witness." (*Stewart*, *supra*, 55 Cal.App.5th at p. 785.)

Second, *Stewart*'s analysis of the difficulty of presenting the suppressed evidence at trial is not helpful or persuasive here. *Stewart* was examining the problem prospectively, based on what could be done in a hypothetical new

32

trial. But this case involved actual defense proffers extended for the first time in the middle of a trial. Unlike in *Stewart*, the disruption and time consumption involved in letting the defense pursue the motive-to-lie theory could not have been limited to expanding the scope of cross-examinations. Also, in *Stewart*, the prosecution's case already involved a trial-within-a-trial of Doe 2's allegations; that was not the case here. Velasquez's complaints about the robustness of the prosecution's presentation overlook this difference. In sum, *Stewart* does not demonstrate the trial court either underweighed the probative value of the motive-to-lie evidence, or overestimated the time that would have been consumed by litigating it.

For all these reasons, we conclude the trial court did not exceed the scope of its discretion under section 352. Because the probative value of the evidence was minimal and the court did not abuse its discretion, "[Velasquez's] constitutional claim also fails." (*Miranda, supra*, 199 Cal.App.4th at p. 1426; see *People v. Jenkins* (2000) 22 Cal.4th 900, 1014–1015 [where evidence excluded under § 352 had little probative value, its exclusion did not violate the defendant's state or federal constitutional right to present a defense].)

### III.

### *No Cumulative Error*

Velasquez contends the cumulative effect of the trial court's evidentiary errors requires reversal of his conviction. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Here, however, we have rejected one of his two claims of error. As a result, there are not multiple errors to accumulate. (*People v. Weaver* (2012) 53 Cal.4th 1056, 1077.)

33

IV.

*Clerical Errors in the Sentencing Minute Order and Abstract of Judgment*

The trial court stated during the July 28, 2023 sentencing hearing that the 16-year sentences imposed on counts 7 and 8 would run consecutively with each other but concurrently with the indeterminate sentences imposed on counts 1 through 6. However, the associated minute order and abstract of judgment do not reflect this. The minute order states "[c]ount 8 to run [c]oncurrent" but makes no similar statement with respect to count 7. Similarly, the determinate section of the abstract of judgment reflects that the 16-year sentence on count 8 is concurrent (via an "X" placed in the column marked "CONCURRENT"), but there is no such notation for the sentence on count 7.

The parties agree, as do we, that the foregoing discrepancies are correctible clerical errors. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Where there is a discrepancy between the oral pronouncement of sentence and the minute order or abstract of judgment, the oral pronouncement controls. (*Ibid*; *People v. Mesa* (1975) 14 Cal.3d 466, 471.) We will remand with directions for the superior court to correct the minute order and abstract of judgment to reflect that the 16-year sentences on count 7 as well as count 8 run concurrently with the indeterminate sentences imposed on counts 1 through 6.

DISPOSITION

The judgment is affirmed. The matter is remanded to the trial court with directions to correct the minute order for the July 28, 2023 sentencing hearing and abstract of judgment to reflect that the 16-year sentences on

34

count 7 as well as count 8 run concurrently with the indeterminate sentences imposed on counts 1 through 6.

DO, J.

WE CONCUR:

IRION, Acting P. J.

DATO, J.